**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **JOSHUA COLE MURPHY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 11 C 831** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Joshua Cole Murphy brings this action under 42 U.S.C. § 405(g), seeking to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits under Title II of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Plaintiff subsequently filed a motion for summary judgment seeking reversal of the Administrative Law Judge's decision. After careful review of the parties' briefs and the record, the Court now denies Plaintiff's motion and affirms the Commissioner's decision.

## PROCEDURAL HISTORY

Plaintiff applied for disability insurance benefits on December 20, 2007, alleging that he became disabled beginning on November 15, 2005 due to depression, anxiety, and panic attacks. (R. 12, 43, 45). The Social Security Administration denied the application initially on April 25, 2008, and again on reconsideration on July 28, 2008. (R. 9, 47-60). Pursuant to Plaintiff's timely request, Administrative Law Judge ("ALJ") Peter J. Caras held

a hearing on June 17, 2010, where he heard testimony from Plaintiff, represented by counsel, Plaintiff's girlfriend, and a vocational expert. (R. 25-42). On June 24, 2010, the ALJ found that Plaintiff is not disabled because he is capable of performing a significant number of jobs available in the national economy. (R. 18-19). The Appeals Council denied Plaintiff's request for review on December 21, 2010. (R. 1-5).

Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. Plaintiff advances three main grounds for reversal. He argues that the ALJ erred in determining that Plaintiff's mental impairments do not meet or equal one of the listed impairments set forth in the regulations. He then challenges the ALJ's residual functional capacity ("RFC") determination on two grounds: first that the ALJ erred in discounting the opinion of the consultative psychologist, and second that the ALJ failed to consider whether he could perform work in light of his past inability to sustain employment.

## FACTUAL BACKGROUND

Plaintiff was born on April 14, 1979, and was 26 years old as of his date last insured ("DLI") of March 31, 2009. (R. 14, 18, 140). He has a limited education, having left school in the ninth grade, and is able to communicate in English. (R. 18, 36, 149). His past relevant work experience included unskilled jobs as a floor tech and a light tech. (R. 18).

A.   **Plaintiff's Medical History**

1.   **Plaintiff's Depression and Anxiety**

The record in this matter indicates that Plaintiff first experienced symptoms of depression and anxiety in late 2007. On November 21, 2007, Plaintiff presented at the emergency room of Illinois Valley Community Hospital (IVCH) in Peru, Illinois complaining

of "numbness in the face, head, both arms, and sometimes in his toes." (R. 212). Dr. Kleven Israelsen examined Plaintiff and noted that Plaintiff "has been under some stress," "[d]enies illicit drug use," "states that there is nothing that makes it worse," and "denies any other complaints." (*Id.*) A physical examination, chest x-ray, and blood tests were normal, and Dr. Israelsen "explained to [Plaintiff] that this may be some kind of anxiety-related episode, but there is no evidence of any acute life threatening condition." (R. 213, 215). Dr. Israelsen diagnosed anxiety, advised Plaintiff to follow up with his physician, and discharged him "in stable condition." (R. 213, 214). Plaintiff was given one milligram of Ativan[1] while he was in the emergency room. (R. 213).

The next day, November 22, 2007, Plaintiff presented at the emergency room of St. Margaret's Hospital in Spring Valley, Illinois with a similar complaint of numbness in his head and upper extremities. (R. 199, 203). The doctor who examined him obtained the prior day's test results from IVCH and noted that "[c]hest x-ray, EKG[,] complete metabolic panel[,] cardiac enzymes[,] CBC[,] cardiac enzymes are reviewed and are all within normal limits." (R. 199, 205-207). The nurse's notes indicate that Plaintiff had been engaged in "a 'discussion' with [his] girlfriend prior to onset"and that he "[h]as been under 'lots of stress'" after leaving his job "'because [he] couldn't take it'." (R. 202). Dr. Richard Twanow diagnosed Plaintiff with numbness, panic attacks, and depression, and discharged him with

---

[1]      According to the National Center for Biotechnology Information, a division of the National Library of Medicine at the National Institutes of Health, Ativan is a brand name for Lorazepam, a class of medications which "is used to relieve anxiety." PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000560/ (last visited Sept. 8, 2011).

prescriptions for Ativan and Sertraline[2] and a follow-up referral to Dr. Kara Fess at The Hygienic Institute Community Health Center. (R. 201, 204).

On November 27, 2007, Plaintiff saw Dr. Fess at the Hygienic Institute. Dr. Fess noted that Plaintiff was seen in emergency rooms twice in the past five days complaining of numbness in his head and that he started on Zoloft four days ago. (R. 209). She further noted that he "[s]ays the symptoms came on abruptly," he has "[n]o hx [history] of panic attacks, anxiety or depression," and he drinks alcohol and admits to "intermittent" use of marijuana. (*Id.*) Dr. Fess assessed Plaintiff's condition as "[a]nxiety/numbness likely panic attacks," but ordered a head CT, the results of which were unremarkable. (R. 209, 232). She advised continued use of Zoloft and Ativan, and also discussed with Plaintiff using alcohol in moderation and avoiding marijuana. (R. 209).

Two months later, on January 30, 2008, Plaintiff returned to the Hygienic Institute complaining of "chest pain" and a "'strange' feeling" in the top of his head. (R. 231). He was not taking any medication at that time. (*Id.*) The doctor diagnosed "anxiety," prescribed Buspar[3] and "[l]imited" Ativan, and recommended that Plaintiff seek treatment at North Central Behavioral Health Systems (NCBH). (*Id.*)

Two weeks later, on February 13, 2008, Plaintiff returned to the IVCH emergency room complaining of "the general feeling that things are not right." (R. 263). Dr. David

---

[2]     Sertraline, commonly known by the brand name Zoloft, "is used to treat depression, . . . panic attacks (sudden, unexpected attacks of extreme fear and worry about these attacks), . . . and social anxiety disorder (extreme fear of interacting with others or performing in front of others that interferes with normal life)." PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001017/ (last visited Sept. 8, 2011).

[3]     Buspar is a brand name for Buspirone, which "is used to treat anxiety disorders or in the short-term treatment of symptoms of anxiety." PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000876/ (last visited Sept. 8, 2011).

Narunatvanich noted that Plaintiff "has a history of anxiety and depression for which he has been seeing Dr. Fess," but that Plaintiff decided on his own to stop taking Zoloft after two weeks or less because "he felt funny" and that he hadn't yet started on the Buspar he was prescribed. (*Id.*) The doctor observed that "overall [Plaintiff] has been noncompliant with his care." (*Id.*) He concluded that Plaintiff "does appear somewhat depressed and anxious but is not actively homicidal or suicidal[,]. . . is not actively psychotic or manic[,] . . . [and shows] [n]o signs of hallucinations or manic behavior or pressured speech." (*Id.*) Concluding that Plaintiff's exam was "otherwise unremarkable except for that [he] appears somewhat depressed," Dr. Narunatvanich discharged Plaintiff after counseling him to take his medication and providing a psychiatric referral for follow-up care. (R. 264).

A month later, on March 13, 2008, Plaintiff returned to the IVCH emergency room complaining that "he seems to be having a panic attack." (R. 265). Plaintiff stated that his tongue was numb and swollen and "he had some itching in his back," however Dr. Israelsen noted that his symptoms "are very unusual for panic disorder" and "seem to be more consistent with an allergic reaction." (R. 265-266). The doctor observed a "lesion" on Plaintiff's back that "may be an early fungal dermatitis." (R. 266). He was diagnosed with an allergic reaction with skin lesion, for which he was instructed to apply a topical cream and take Benadryl, and he was advised to follow up with Dr. Shawn Bailey regarding the Celexa[4] he reported taking. (*Id.*)

A week later, on March 20, 2008, Plaintiff returned to the Hygienic Institute for a follow-up visit with Dr. Fess. (R. 227). He complained of ringing in his ears that wakes him

---

[4]     Celexa is a brand name for Citalopram, which "is used to treat depression." PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001041/ (last visited Sept. 8, 2011).

up at night and stated that he is "[u]nable to work b/c of problems." (*Id.*) He indicated that Lorazepam "helps." (*Id.*) Dr. Fess noted that Plaintiff went to NCBH but did not follow up because he "didn't feel it was helpful." (*Id.*) She assessed Plaintiff as suffering from anxiety, prescribed Lorazepam, and advised him to return for a follow-up visit in three months. (*Id.*) A subsequent MRI of Plaintiff's brain taken in May 2008 indicated sinus inflammation and mastoiditis,[5] but was otherwise normal and unremarkable. (R. 267).

## 2. Agency Reviewing Psychologists

On March 21, 2008, Dr. Mark Langgut, PhD administered a psychological assessment of Plaintiff upon referral from the Bureau of Disability Determination Services ("DDS"). (R. 239-243). The assessment consisted of a clinical interview, psychological consultation, review of medical records, and mental status examination. (R. 240). Dr. Langgut's report, dated March 27, 2008, diagnosed Plaintiff with dysthymic disorder,[6] anxiety disorder with panic features, alcohol abuse in partial remission, cannabis abuse in recent remission, and personality disorder NOS (not otherwise specified) (R. 243). He concluded that Plaintiff "has difficulty with day to day functioning with significant symptoms of depression and anxiety and he has struggled with issues of addiction." (*Id.*) He further concluded that "[Plaintiff's] ability to care for himself is limited as he has periods of homelessness and is unable to maintain productive work due to personality and emotional difficulties." (*Id.*)

---

[5] Mastoiditis is "an infection of the mastoid bone" which is "usually caused by a middle ear infection." PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002029/ (last visited Sept. 8, 2011)

[6] Dysthymic disorder is "a chronic type of depression in which a person's moods are regularly low . . . [h]owever, symptoms are not as severe as with major depression." PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001916/ (last visited Sept. 8, 2011).

On April 24, 2008, Dr. Thomas Low, PhD completed an initial Psychiatric Review Technique for the DDS. (R. 244-257). He evaluated Plaintiff under categories 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.08 (personality disorders). (R. 244). Dr. Low noted the presence of dysthymic disorder, anxiety disorder with panic features, and personality disorder NOS. (R. 247, 249, 251). However, he found Plaintiff's functional limitations to be "mild" in terms of restrictions or difficulties with respect to daily living, social functioning, and maintenance of concentration, persistence, or pace. (R. 254). Dr. Low also found no episodes of decompensation of extended duration. (*Id.*) Accordingly, he concluded that Plaintiff's impairments are not severe. (R. 244).

On July 23, 2008, Dr. Ronald Havens, PhD completed a Request for Medical Advice for DDS upon reconsideration. (R. 258-260). Dr. Havens affirmed Dr. Low's determination that Plantiff's impairments are not severe and further concluded that additional medical records submitted by Plaintiff at the reconsideration level do not change or affect the initial assessment. (R. 260).

## B. Plaintiff's Testimony

At the hearing before the ALJ on June 17, 2010, Plaintiff testified that since 2008 he has experienced anxiety or panic attacks "[m]ostly . . . every day," and that while some days "are better than others . . ., it's something every day usually." (R. 29). When he experiences a panic attack, "it'll start off with funny feelings in [his] head and . . . numbness in [his] arms," and sometimes "troubles within [his] chest areas [and] . . . nauseous feelings," including vomiting. He noted that it "feels like [he is] going to have a stroke or a seizure" and "it's just overwhelming." (R. 28). Plaintiff testified that for "at least half the month" he has "really bad days," during which all he can do is sit or lie down and watch

7

television.  (R. 30-31).  He has three or four "good days" per month, during which he has "spurt[s]" where he can do "normal household chores," such as laundry, dishes, vacuuming, and cleaning, although sometimes he has had to "call it quits and just go to my room."  (R. 31-32).

Plaintiff testified that he tried seeking work at one point and "went to a job" but he "couldn't handle it."  (R. 34).  He has had difficulty maintaining employment because "anxiety" and "overwhelming feelings" make it "hard to . . . even get up and make it to work" some days and requires him to "leave work" on other days.  (R. 28).  Plaintiff stated that "a lot of things sort of trigger [panic attacks]," including car rides and "trying to concentrate on something, . . . even just trying to read up on something."  (R. 29).  As a result, he has trouble interacting with people, including his own family who he hasn't "been around . . . in a couple years."  (R. 29-30).  He testified that when he reads a book or materials on the computer, he often "can't focus" and will have to re-read it because he "[w]on't even know what [he] just read."  (R. 32).  He also stated that he has difficulty "stick[ing]" to a schedule or tasks and also "can't stick to . . . a steady sleep schedule."  (R. 32-33).

Plaintiff testified that he lives with his grandfather and that his girlfriend stays with him about half of each week.  (R. 30).  It is "difficult" for him to leave the house, but he "force[s] [him]self" to "go for a walk around a couple blocks."  (R. 33-34).  He and his girlfriend used to go hiking, camping and to the movies, but now they stay in, she cooks, and they watch a movie or sit on the porch together.  (R. 36).  He testified that he takes Lorazepam, which "helps to an extent" but "doesn't cure it," and that his doctors "put [him] on lots of antidepressants and . . . none of them worked . . . [and they] actually made [him] feel worse."  (R. 35).

## C.    Girlfriend's Testimony

At the hearing before the ALJ, Plaintiff's girlfriend Cary Matusik testified that she had known Plaintiff for twelve years and dated him for the past six years.  (R. 37).  She stated that she visits Plaintiff four or five days per week, during which time she has observed Plaintiff's anxiety attacks "every day non-stop."  (R. 38, 39).  When his attacks occur, "his heart will be pounding, he's feeling really sweaty . . . [and] he feels like he's going to die or feeling like he's having a stroke or a heart attack."  (R. 38).  She was unable to identify what brings about the attacks, but stated that she rubs his shoulders when they occur and "he goes to sleep."  (*Id.*)  She testified that the attacks prevent them from going to social gatherings, movie theatres, or activities outside Plaintiff's home, and that he spends most of his time sleeping.  (R. 39).

## D.    Vocational Expert's Testimony

Melissa Benjamin testified at the hearing as a vocational expert ("VE").  (R. 39-42).  The ALJ described a hypothetical individual of Plaintiff's age and educational level, with no consideration given to past work, who has no exertional limitations and is limited to unskilled work that has no strict quotas, is not fast-paced, emphasizes completion of tasks over an eight-hour shift rather than an hourly production rate, is not very stressful, and involves occasional interaction with people.  (R. 40).  The VE testified that at the medium, unskilled level, such an individual could perform the requirements of other representative jobs available in the Illinois economy, such as janitor (60,000 jobs) and meat clerk (50,000 jobs).  (R. 40-41).  At the light, unskilled level, such an individual could perform the work of a laundry sorter (13,000 jobs), cleaner (20,000 jobs), or mail clerk (6,000 jobs).  (R. 41).  At the sedentary level, such an individual could perform the work of a sorter (10,000 jobs),

mail clerk (4,000 jobs), or packer (16,000 jobs). (*Id.*) The VE testified that additional jobs of comparable numbers are available at each of these levels. (*Id.*) She stated, however, that there would be no jobs available if the individual cannot perform on-task for at least 85% of the workday. (R. 41-42). She also stated that no jobs would be available to someone who has two unexcused absences per month. (R. 42).

### E.    ALJ's Decision

In his written decision, the ALJ found that Plaintiff was not disabled prior to the date last insured of March 31, 2009. (R. 14, 19-20). In applying the five-step sequential analysis required by 20 C.F.R. § 404.1520(a), the ALJ first determined that Plaintiff was not engaged in substantial gainful activity since the alleged onset date of November 15, 2005. (R. 14). At Step 2, he then determined that Plaintiff's depression, anxiety, and history of alcohol and marijuana abuse constitute severe impairments. (*Id.*). However, at Step 3, the ALJ determined that none of these impairments met or medically equaled any of the listed impairments identified in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 14-16). Specifically, the ALJ found that Plaintiff has only moderate restriction of daily living activities, moderate difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, and that he has experienced no episodes of decompensation of extended duration. (R. 15).

Proceeding to Step 4, the ALJ concluded that Plaintiff retains the RFC to perform a full range of work at all exertional levels except that Plaintiff "is limited to unskilled work with no strict quotas or fast paced work (as in assembly) and where the emphasis is on completing the work in an 8-hour shift rather than an hourly production basis; he is limited to jobs that are not regarded as very stressful; and he is limited to occasional interaction

with people." (R. 16). In reaching this determination, the ALJ considered Plaintiff's testimony, his girlfriend's testimony, and the medical records, and then concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible" to the extent they are inconsistent with the residual functional capacity (RFC) finding. (R. 17). Of particular note, the ALJ observed that "[t]here is nothing to indicate that [Plaintiff's] mental conditions are not treatable or remediable with therapy." (*Id.*) The ALJ also found it significant that "[n]o treating physician has concluded that [Plaintiff] is entirely disabled due to his mental condition." (*Id.*) In addition, the ALJ did not find Dr. Langgut's opinion persuasive since, as a consultative examiner "who only saw [Plaintiff] for 50 minutes on one occasion, his opinion is not entitled to controlling weight." (R. 18). Moreover, the ALJ noted that Dr. Langgut's opinion "conflicts with the assessments of [Plaintiff's] treating doctors, none of whom have opined that [Plaintiff] is unable to work." (*Id.*)

The ALJ then found that Plaintiff is unable to perform his past relevant work as a floor tech or light tech because the nonexertional requirements of these jobs exceed his capabilities. (R. 18). Relying on the vocational expert's testimony, however, the ALJ concluded that there are other jobs that exist in sufficient numbers in Illinois that Plaintiff can perform, given his age, education, work experience, and RFC. (R. 18-19). Accordingly, the ALJ found that Plaintiff was not disabled as of the date last insured. (R. 19-20).

**<u>DISCUSSION</u>**

**A.      Standard of Review**

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act.   *See* 42 U.S.C. § 405(g).   A "court will reverse an ALJ's denial of disability benefits only if the decision is not supported by substantial evidence or is based on an error of law."   *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).   Evidence is considered substantial "so long as it is 'sufficient for a reasonable person to accept as adequate to support the decision.'"   *Ketelboeter v. Astrue*, 550 F.3d 620, 624 (7th Cir. 2008) (quoting *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)).   The reviewing court may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations."   *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion."   *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008); *see also* 42 U.S.C. § 405(b)(1) (denial of benefits must contain a discussion of the evidence and a statement of the Commissioner's reasons).

**B.      Disability Standard**

A claimant who can establish he is "disabled" as defined by the Social Security Act, and was insured for benefits when his disability arose, is entitled to disability insurance benefits.   42 U.S.C. §§ 423(a)(1)(A), (E); *see also Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009).   "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."   42 U.S.C.

§§ 423(d)(1)(A), 1382(a)(3)(A).  An individual is under a disability if he is unable to do his previous work and cannot, considering his age, education, and work experience, partake in any gainful employment that exists in the national economy.  *Id.* at § 423(d)(2)(A). Gainful employment is "the kind of work usually done for pay or profit, whether or not a profit is realized."  20 C.F.R. § 404.1572(b).

In order to determine whether a claimant is disabled, the ALJ conducts a standard five-step inquiry, set forth in 20 C.F.R. § 404.1520(a)(4), which requires the ALJ to consider in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals one of a list of specific impairments enumerated in the regulations; (4) whether the claimant can perform his past relevant work; and (5) whether the claimant is able to perform other work in the national economy.  *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001) (citations omitted). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled."  *Id.* (quoting *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)); *see also* 20 C.F.R. § 404.1520(a)(4).

## C. Analysis

In his motion, Plaintiff makes three main arguments for reversal, asserting that the ALJ erred by:  (i) determining that his mental impairments do not meet or equal one of the listed impairments set forth in the regulations; (ii) discounting the opinion of the consultative psychologist in determining his RFC; and (iii) failing to consider his demonstrated inability to sustain employment in determining his RFC.  For the reasons set forth below, this Court denies Plaintiff's motion and affirms the ALJ's decision.

### 1.    The Listed Impairment Finding

Plaintiff challenges the ALJ's finding at Step 3 that none of his impairments met or medically equaled any of the listed impairments identified in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  (R. 14-16).  The Listings identify and describe impairments that are considered severe enough *per se* to prevent an individual from performing significant gainful activity, regardless of age, education, and work experience.  20 C.F.R. § 404.1525(a).  Thus, if a claimant satisfies the requirements of a listed impairment, he is presumptively considered disabled and the inquiry ends.  *Id.* at § 404.1520(d); *see Lavarier v. Astrue*, No. 09 CV 7881, 2011 WL 2116412, *15 (N.D. Ill. May 27, 2011); *Stramaglio v. Astrue*, No. 09 C 50040, 2011 WL 1118725, *7 (N.D. Ill. Mar. 28, 2011).  Here, Plaintiff argues that the ALJ improperly evaluated whether he is impaired under Listings 12.04 (Affective Disorders) and 12.06 (Anxiety Related Disorders) and further that the ALJ erred by not considering whether he is impaired under Listing 12.07 (Somatoform Disorders). These arguments are unavailing since the ALJ properly considered Listings 12.04 and 12.06 and was not required to consider Listing 12.07, and, in any event, Plaintiff cannot establish an impairment under Listing 12.07.

A claimant suffering from an affective disorder or an anxiety related disorder meets the listed severity level under Listings 12.04 or 12.06, respectively, if enough listed criteria under both categories A and B are present.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04 & 12.06; *see also Larson v. Astrue*, 615 F.3d 744, 747-748 (7th Cir. 2010);  *Stramaglio*, No. 09 C 50040, 2011 WL 1118725, *8.  Alternately, a claimant can establish the required severity level by meeting the category C criteria under Listing 12.04 or by meeting both the categories A and C criteria under Listing 12.06.  20 C.F.R. Pt. 404, Subpt. P, App. 1,

§§ 12.04 & 12.06; *Stramaglio*, No. 09 C 50040, 2011 WL 1118725, *8. The category A criteria consist of a list of symptoms which must be medically documented. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(A) & 12.06(A). The category B criteria require a claimant to show that at least two of the following symptoms are present: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. *Id.* at §§ 12.04(B) & 12.06(B).

Plaintiff's argument concerning the ALJ's determinations under Listings 12.04 and 12.06 is not fully developed, however he appears to challenge generally the factual support for the ALJ's determination that his restrictions or difficulties as to the first three category B criteria are moderate, rather than marked. The regulations define "marked" to mean "more than moderate but less than extreme," and a limitation is marked when it "interfere[s] seriously with [claimant's] ability to function independently, appropriately, and on a sustained basis." *Id.* at § 12.00(C), citing 20 C.F.R. §§ 404.1520a & 416.920a. In finding Plaintiff's daily living restriction to be moderate, the ALJ stated that he relied on Plaintiff's testimony that "on 'good' days," he does laundry, washes dishes, cleans, and vacuums, and he does not drive because his license was revoked following a DUI. (R. 15). Plaintiff challenges this finding because he "has more bad days than good days where he does not do anything" and he "has lost numerous jobs." (Doc. 16 at 11). In stating that Plaintiff has "good" days, the ALJ implicitly acknowledged that Plaintiff has "bad" days. Nonetheless, the ALJ found that the various household activities Plaintiff is able to perform on "good" days, combined with the fact that his inability to drive arises out of his DUI and not his impairments, are sufficient evidence that his daily living restriction is moderate rather than

marked.  (R. 15).  As for Plaintiff's assertion that he has lost numerous jobs, he does not cite to the factual record and it is unclear where or whether this evidence can be found, the context surrounding it, and how or whether it may establish a marked restriction.  In any event, the ALJ cited evidence sufficient for a reasonable person to conclude that Plaintiff has a moderate, rather than marked, restriction in this area, and it is not this Court's role to reconsider the evidence simply because Plaintiff would prefer a different conclusion. *Ketelboeter v. Astrue*, 550 F.3d 620, 624 (7th Cir. 2008)  (quoting *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (evidence is substantial "so long as it is 'sufficient for a reasonable person to accept as adequate to support the decision.'"); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (reviewing court may not "displace the ALJ's judgment by reconsidering facts or evidence.")

Next, in finding that Plaintiff has moderate difficulties with social functioning, the ALJ acknowledged that Plaintiff has anxiety and panic attacks and "has difficulty leaving his house and socializing," but observed that he "lives with his grandfather and has had a girlfriend for 6 years."  (R. 15).  Plaintiff challenges this finding on the ground that he "does not socialize with his family other than his grandfather."  (Doc. 16 at 11).  But again, the ALJ's finding that Plaintiff has only moderate difficulties with social functioning is substantially supported by the evidence that Plaintiff shares a home with a close relative and has maintained a romantic relationship for six years.

Finally, in finding that Plaintiff has moderate difficulties with concentration, persistence, or pace, the ALJ acknowledged that Plaintiff suffers from depression and "has difficulty concentrating due to anxiety."  (R. 15).  Plaintiff's challenge to this finding consists solely of his conclusory assertions that "Ativan makes him tired" and he "cannot

concentrate." (Doc. 16 at 12). Yet again, Plaintiff does not cite any evidence that his medication makes him tired or that he "cannot" concentrate, and it is not this Court's obligation to scour the record in search of such evidence. *See Hermann v. Astrue*, No. 07 C 6914, 2010 WL 356233, *13 (N.D. Ill. Feb. 1, 2010) (a court is not required to "scour a record" for evidence supporting a party's argument) (quoting *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005)). Regardless, Plaintiff does not explain how being tired creates a marked difficulty with concentration rather than a moderate one, nor does he identify any evidence to contradict the ALJ's conclusion that he has moderate difficulty concentrating due to his anxiety.

Plaintiff also argues that the ALJ erred by failing to consider whether he has a somatoform disorder under Listing 12.07. A somatoform disorder consists of "[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.07. To establish a somatoform disorder under Listing 12.07, a claimant must satisfy the criteria in both the A and B categories. *Id.* In this case, however, there is simply no medical evidence of a somatoform disorder. There is no record evidence from Plaintiff's treating physicians of such symptoms, let alone such a diagnosis. Rather, the ER and clinic doctors he saw each diagnosed some combination of depression, anxiety, and/or panic attacks. (R. 201, 213, 227, 264). Likewise, while the DDC consulting physicians — Dr. Langgut, Dr. Low, and Dr. Havens — diagnosed Plaintiff with impairments under other listings, none of them diagnosed a somatoform disorder under Listing 12.07. (R. 239-260). Not surprisingly, Plaintiff's brief does not cite any evidence, but simply makes a broad generalization that "[h]is illnesses were characterized by 'physical symptoms for which there are no

17

demonstrable organic findings or known physiological mechanisms." (Doc. 16 at 11). Furthermore, neither Plaintiff nor his attorney raised the issue of such an impairment at the hearing before the ALJ. In light of the complete lack of medical evidence of such a disorder, and Plaintiff's failure to raise it before the ALJ, the ALJ did not err in failing to consider whether Plaintiff was impaired under Listing 12.07. Even if this were not the case, any failure to consider Listing 12.07 is harmless since this listing requires the claimant to satisfy the same category B criteria as Listings 12.04 and 12.06, which, as discussed above, the ALJ properly determined Plaintiff had not done. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.07(B).

Accordingly, the ALJ's impairment finding is supported by substantial evidence and is affirmed.

### 2.    The RFC Determination

Plaintiff next argues that the ALJ erred in his determination of Plaintiff's RFC by not giving sufficient weight to the consulting psychologist's opinion and by failing to consider whether Plaintiff could perform work in light of his past inability to sustain employment. In order to determine at Steps 4 and 5 of the analysis whether the claimant can perform his past relevant work and/or adjust to other work, respectively, the ALJ must first assess the claimant's RFC, which is defined as the most the claimant can do despite his limitations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545; Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, *2. This requires an ALJ to consider all functional limitations and restrictions that stem from medically determinable impairments, including those that are not severe. *See* SSR 96–8p, 1996 WL 374184, *5. An ALJ need not discuss every piece of evidence, but must logically connect the evidence to the ALJ's conclusions. *See Jones v. Astrue*, 623

F.3d 1155, 1160 (7th Cir. 2010); *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). As discussed below, there is substantial evidence to support the ALJ's findings in the RFC.

### a. The Consultative Psychologist's Statement

Plaintiff first argues that the ALJ erred by failing to give sufficient weight to State agency consultative psychologist Dr. Mark Langgut's statement that Plaintiff "is unable to maintain productive work due to personality and emotional difficulties." (R. 243). This argument is unavailing since the reason the ALJ gave for discounting Dr. Langgut's statement was sufficient and within his discretion and, in any event, the statement itself was not a medical opinion requiring consideration.

A treating source's opinion is generally given greater deference than a consultative examiner's opinion since treating sources are "most able to provide a detailed, longitudinal picture" of a claimant's medical impairments. 20 C.F.R. § 404.1527(d)(2); *see also Slaughter v. Astrue*, No. 08-CV-2776, 2010 WL 4625079, *6 (N.D. Ill. Nov. 5, 2010) ("Unlike treating physicians, whose opinions are presumptively entitled to controlling weight, the opinions of nontreating physicians receive no such deference.") (internal citations omitted). A treating source's opinion is given controlling weight when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *see also Bouchard v. Barnhart*, 38 F. App'x 332, 336 (7th Cir. 2002). Here, the ALJ acknowledged Dr. Langgut's opinion that Plaintiff is unable to work, but concluded that the opinion was not persuasive. (R. 18). In explaining his determination to discount Dr. Langgut's opinion on this issue, the ALJ noted that "[a]s an examining doctor who only saw the claimant for 50 minutes on one occasion, his opinion is not entitled to controlling weight." (*Id.*) The ALJ

then went on to note that "[m]oreover, his opinion conflicts with the assessments of the claimant's treating doctors, none of whom have opined that the claimant is unable to work." (*Id.*)

Plaintiff's argument on this issue is under-developed. He asserts in conclusory fashion that Dr. Langgut's opinion does not conflict with those of Plaintiff's treating doctors because they "were clear in stating that he had a mental health problem of anxiety and panic attacks and consistently asked him to get mental health treatment to no avail," including prescribing Ativan which "caused fatigue." (Doc. 16 at 12). But the mere fact that Plaintiff's treating doctors diagnosed him with anxiety and panic attacks and instructed him to seek further treatment does not automatically render him unable to work. Nor can this conclusion be drawn based on the fact that he was prescribed medication that made him tired. In fact, there was no evidence before the ALJ from any treating doctor stating that Plaintiff was unable to work. Dr. Langgut was the only medical source to voice this opinion. But as the ALJ explained in his decision, Dr. Langgut was a consultative examiner who met with Plaintiff on one occasion for less than an hour, therefore it was within the ALJ's discretion to give less weight to Dr. Langgut's opinion than he gave to those of Plaintiff's treating doctors. *See* 20 C.F.R. § 404.1527(d)(2).

Even if this were not the case, the statement still would not be entitled to any consideration. Opinions concerning whether a claimant is disabled or unable to work are not medical opinions, but rather are opinions that are reserved for the Commissioner. 20 C.F.R. §§ 404.1527(e); *see also id.* at § 416.927(f)(2)(I) (ALJ must consider findings and opinions of State agency medical and psychological consultants as opinion evidence, "except for the ultimate determination about whether [claimant] is disabled.") Therefore,

while the ALJ must consider Dr. Langgut's opinions concerning the nature and severity of Plaintiff's impairments, *see id.* at § 404.1527(a)(2), the ALJ was not required to give any weight to Dr. Langgut's ultimate conclusion that Plaintiff is unable to work. *See id.* at § 404.1527(e). For this same reason, Plaintiff's argument that the ALJ should have developed the factual record further to determine if there is support for Dr. Langgut's statement is misplaced. While an ALJ may have an obligation to seek additional evidence or clarification when medical opinion evidence contains conflicts or ambiguities, *see* 20 C.F.R. § 404.1512(e)(1), that obligation is not triggered here because Dr. Langgut's conclusion that Plaintiff is unable to work is not medical opinion evidence.

Plaintiff also argues unsuccessfully that a remand is justified because Dr. Langgut's statement is supported by purportedly new evidence from Kara Fess, one of Plaintiff's treating doctors, who stated in a letter dated August 19, 2010 that "[a]s of this time, I do not feel that [Plaintiff] is capable of gainful employment." (R. 283). The letter was first submitted to the Appeals Council with Plaintiff's request for review of the ALJ's decision. (R. 6). A reviewing court "may order additional evidence to be taken before the Commissioner upon a showing that there exists 'new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in the prior proceeding.'" *See Schmidt v. Barnhart*, 395 F.3d 737, 741-742 (7th Cir. 2005) (quoting 42 U.S.C. § 405(g)). Here, Dr. Fess treated Plaintiff periodically for two and a half years prior to the hearing, yet Plaintiff identifies no reason why such a letter could not have been obtained from Dr. Fess prior to the hearing. *See Schmidt*, 395 F.3d at 741-742 ("Evidence is 'new' if it was 'not in existence or available to the claimant at the time of the administrative proceeding.") (citation omitted). Nor can he show that the letter is material

considering that, like Dr. Langgut's statement, Dr. Fess's statement about Plaintiff's inability to work is not medical opinion evidence and therefore need not be considered. *See* 20 C.F.R. §§ 404.1527(e). In addition, the letter post-dates the DLI by nearly a year and a half and is non-specific as to whether Dr. Fess's conclusion about Plaintiff's inability to work applies to any time period prior to the DLI, or whether, as the letter seemingly states, it applies to the time at which the letter was written. Thus, even if the letter had been before the ALJ, he would have been entitled to discount it. *See Eichstadt v. Astrue*, 534 F.3d 663, 667 (7th Cir. 2008) (finding no error where ALJ discounted evidence that post-dated the DLI and which did not support contention that plaintiff was disabled prior to the DLI). Accordingly, because the letter from Dr. Fess is not new evidence and her statement about Plaintiff's inability to work does not constitute a medical opinion entitled to consideration, Plaintiff's request for a remand is unavailing.

### b. Capacity to Sustain Employment

Plaintiff next argues that the ALJ erred in determining the RFC by failing to consider whether he could perform work in light of his prior inability to maintain employment. Again, Plaintiff's argument is not well-developed or supported by evidence. He argues generally that the ALJ erred by not considering whether he could perform "the demands of a full-time competitive job in a normal work setting in view of the fact that he had never held such a job." (Doc. 16 at 14). In particular, Plaintiff notes that his last significant gainful activity was in 2002, and from 2003 to 2005 he held and "lost" 12 different jobs. (*Id.*) But Plaintiff cites no evidence indicating that his impairments were the reason for his employment woes. Not only does this employment history pre-date Plaintiff's onset date of November 15, 2005 (R. 14), it also pre-dates by two years the first medical evidence of his impairments (R. 212).

Plaintiff testified only generally and briefly about his inability to work due to anxiety, but did not testify specifically about these 12 jobs and the reasons why they were short-lived. (R. 28, 34). In fact, he does not even identify where in the record one can find evidence of these 12 jobs. This Court's review of the record reveals that the work history report Plaintiff submitted to the Social Security Administration in January 2008 identifies six jobs that he held over the prior 15 years, two of which were identified as laborer jobs through temporary services companies. (R. 151). An agency printout of his earnings indicates income from 8 sources from 2003 through 2005, including two temporary staffing companies. (R. 124-125). The very nature of a temporary job is that it is not permanent, so it cannot be concluded without additional evidence that Plaintiff "lost" these jobs due to his impairments. Furthermore, in the work history report, Plaintiff acknowledged that he does not get along well with authority figures, such as bosses, and that he once was fired or laid off from a job because of problems getting along with other people. (R. 167). So again, the mere fact that Plaintiff has held numerous jobs alone is not evidence that he is unable to work due to his depression, anxiety, or panic attacks.

Finally, Plaintiff makes a cursory argument that the hypothetical the ALJ posed to the VE is deficient because it failed to state explicitly that Plaintiff has moderate difficulties with concentration, persistence, and pace. The Seventh Circuit has held that hypotheticals that omit the terms "concentration, persistence and pace" are not erroneous "when it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform," usually "when a claimant's limitations were stress- or panic-related and the hypothetical restricted the claimant to low-stress work." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) (collecting

cases). In this case, the ALJ explicitly accounted for Plaintiff's need for a low-stress environment by posing a hypothetical that was limited to jobs that, among other things, have "no strict quotas," are "not fast paced," are "[n]ot regard[ed] as very stressful" and require only "occasional interaction with people." (R. 40). Accordingly, the hypothetical is not erroneous since it excluded those fast-paced and high-stress jobs that are likely to trigger the symptoms of depression and anxiety which are at the root of Plaintiff's moderate limitations on concentration, persistence, and pace.

In conclusion, the ALJ's RFC assessment is supported by substantial evidence and is affirmed.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 15] is denied. The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: September 12, 2011

_Sheila Finnegan_
SHEILA FINNEGAN
United States Magistrate Judge